IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

DENISE R. REED                                                                                    PLAINTIFF

V.                                              NO. 08-4116

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY                              DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Denise R. Reed, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner), denying her claim for disability insurance benefits under Title II of the Social Security Act (ACT).

**Procedural Background:**

Plaintiff filed her application for disability insurance benefits on April 7, 2006, alleging she became disabled on December 19, 2005. (Tr. 48-50). Plaintiff contended that she was disabled because of a hip replacement, arthritis and right ear hearing loss. (Tr. 70). Pursuant to Plaintiff's request, a hearing was held before the Administrative Law Judge (ALJ) on January 30, 2008, where Plaintiff appeared and testified. (Tr. 315-337). By written decision dated May 30, 2008, the ALJ found that Plaintiff was not disabled within the meaning of the Act, and was therefore not entitled to benefits. (Tr. 7-17). The Appeals Council denied Plaintiff's request for review on November 18, 2008. (Tr. 2-4). Plaintiff now seeks judicial review of that decision.

**Evidence Presented:**

Plaintiff was born on February 19, 1961, graduated from high school and completed two years of college. (Tr. 318.). She subsequently received a certificate as a medical clerk. (Tr. 319). Plaintiff was most recently employed by Tyson, where she worked for ten years as a grinder or inspector, inspecting chicken parts to separate the good parts from the bad ones, which required her to stand all day long. (Tr. 320). Plaintiff was 5' 5" and weighed 200 pounds at the time of the hearing. (Tr. 329).

As early as 1996, Plaintiff began complaining of back pain to Dr. Hasmakh M. Patel, one of her treating physicians. (Tr. 298, 301, 302, 303). Plaintiff later began seeing Dr. Douglas E. Thompson, of the Collom & Carney Clinic. In December of 2004, Plaintiff complained of significant stiffness and tenderness in both hips, with the left greater than the right. (Tr. 233). She had no relief from taking glucosamine, and Dr. Thompson wanted to refer her for steroid injections in her left hip, noting that if that failed, they would need to consider hip replacement. (Tr. 233).

On February 9, 2005, Plaintiff presented herself to the Emergency Room at Howard Memorial Hospital, complaining of severe pain, and was found to have a 4 mm kidney stone. (Tr. 118). A radiology report from the hospital indicated that advanced degenerative changes were seen in the left hip. (Tr. 119, 122).

On March 15, 2005, Dr. Thompson saw Plaintiff, who complained that her left hip was starting to bother her and that her neck was significantly bothering her, with some numbness and tingling that went from her neck down to her right arm. (Tr. 229). X-rays of her right shoulder were normal. (Tr. 229). On March 19, 2005, Dr. Thompson noted that Plaintiff had cervical spondylosis with annular disc bulges, most pronounced at the C5-C6 level. (Tr. 228). He also found small left

paracentral disc protrusion at the C6-C-7 level as well as an apparent moderate in size disc protrusion at the T3-T4 level. (Tr. 228). He recommended a follow-up MRI of the thoracic spine to evaluate the disc protrusion and apparent foraminal encroachment, and found variable foraminal stenosis, most pronounced at the C5-C6 level. (Tr. 228). Dr. Allen V. Havener, of the Collom & Carney Clinic, completed a radiology report on March 21, 2005, where the impression was:

> Cervical spondylosis with annular disc bulges, most pronounced at the C5-C6 level. Small left paracentral disc protrusion at the C6-C7 level as well as apparent moderate in size disc protrusion at the T3-T4 level. Would recommend follow-up MRI of the thoracic spine to evaluate the disc protrusion and apparent foraminal encroachment. Variable foraminal stenosis, most pronounced at the C5-C6 level.

(Tr. 171).

Pursuant to Dr. Thompson's recommendation, on April 15, 2005, April 27, 2005, and May 3, 2005, Plaintiff had three steroid injections in her hip. (Tr. 133, 147, 156). She tolerated each injection well and reported good relief from them. However, on October 31, 2005, Plaintiff's hip pain returned and Plaintiff was diagnosed by Dr. Thompson with bilateral hip osteoarthritis. (Tr. 224). X-rays showed severe bone-on-bone arthritis with some cystic changes in her left hip and early arthritis in the right hip. (Tr. 224). Dr. Thompson recommended total hip replacement. (Tr. 224).

Prior to Plaintiff's December 19, 2005 hip replacement surgery, pre-op clearance was conducted on December 12, 2005, at the Collom & Carney Clinic. The following notations were made in that record: arthritis all over; HEARING LOSS IS NOTED; gait intact; station, posture normal; painful ROM of the left hip. (Tr. 180-181). On December 15, 2005, in his preadmission history and physical, Dr. Thompson stated that Plaintiff complained of arthritis all over her body and did report some hearing loss. (Tr. 178). Plaintiff planned to go home after the hip replacement

surgery after a short stay in the hospital, if possible, rather than go to rehabilitation, but Dr. Thompson was going to assess that possibility after surgery. (Tr. 179).

The hip replacement surgery was conducted by Dr. Thompson on December 19, 2005, and the Operative Record reflected that during the surgery, there was a fracture of the proximal femur anteriorly. (Tr. 186). Because of the fracture, Dr. Thompson determined that Plaintiff would need to be kept nonweight bearing for approximately six weeks in order to allow the fracture to heal, and then would slowly start her on progressive weight bearing. (Tr. 187). He also mentioned that Plaintiff's recovery might be slow because of the fracture. (Tr. 187).

Plaintiff spent several days after surgery at the Healthsouth Rehabilitation Hospital of Texarkana, (Healthsouth) with Dr. Richard Sharp noting, among other things, that there were no hearing or visual problems. (Tr. 197). When Plaintiff was discharged from Healthsouth on January 3, 2006, she was ambulating 150 feet with a rolling walker. (Tr. 196).

Follow-up visits to Dr. Thompson indicated good progress with her hip replacement. He did not believe Plaintiff was going to have any long term disability, but recommended that she speak with her employer about possible short term disability. (Tr. 207). By February 28, 2006, Plaintiff was 100% weight bearing with a walker, although she indicated that she still had some weakness in the left leg, but no pain. (Tr. 205). Dr. Thompson told her she could be 100% weight bearing and to get rid of the walker. (Tr. 205).

On April 7, 2006, the day Plaintiff applied for disability insurance benefits, a field office face-to-face interview was conducted, and the interviewer noted that Plaintiff had difficulty hearing, answering, standing, and walking. (Tr. 57). The interviewer further stated:

> Claimant had trouble hearing the questions and therefore had problems answering them. She was cooperative and pleasant and dressed appropriately for this interview. She had a distinct limp due to the hip replacement and did appear to have problems when standing and walking due to this condition.

(Tr. 57).

Four days later, on April 11, 2006, Plaintiff was again seen by Dr. Thompson. She was 100% weight bearing and not using any type of ambulatory aid. (Tr. 203). Plaintiff had no pain, but had weakness and also walked with a limp. (Tr. 203). When Dr. Thompson asked her whether she wanted to try and improve the limp, Plaintiff said she was willing to try. (Tr. 203). Dr. Thompson noted that Plaintiff did have a Trendelenburg type gait, but showed good muscle tone in the abductor muscle. In his Plan, Dr. Thompson stated:

> 1. I am going to send her to physical therapy for hip strengthening and gait training. I think much of her problems is just learned habit. 2. I will see the patient back in six weeks and see how she is doing. In terms of her disability I am going to leave that up to Tyson in terms of whether or not they want to keep her on long-term disability or try to find a position where she can work. From my standpoint, the limp is not related to pain and is likely habitual in nature.

(Tr. 203).

The records reflect that the last visit Plaintiff made to Dr. Thompson occurred on May 25, 2006, where Plaintiff reported that she was very happy with her results. She was having no pain in her hip, but still used a cane because she had some weakness in her hip. (Tr. 260). Dr. Thompson again noted that she walked with a Trendelenburg type gait, but had no muscular atrophy in the hip. Plaintiff felt that Dr. Thompson did a very good job. However, Dr. Thompson could not see any cause for the weakness that she had in her left hip, as she had good muscle tone, no atrophy and no pain. (Tr. 260). He recommended that she try to get off of the cane as much as possible and did not

believe there was much more that she was going to improve. He felt she had reached maximum medical improvement. (Tr. 260).

A Physical Residual Functional Capacity Assessment was completed by a non-examining physician, Dr. Steve Owens, on July 10, 2006. (Tr. 263-270). He found that Plaintiff could:

- occasionally lift and/or carry 20 pounds;
- frequently lift and/or carry 10 pounds;
- stand and/or walk about 6 hours in an 8-hour workday;
- sit for about 6 hours in an 8-hour workday;
- push and/or pull in an unlimited amount.

(Tr. 265). Dr. Owens did note that Plaintiff had postural limitations, i.e., that she could only occasionally climb, balance, stoop, kneel, crouch and crawl. (Tr. 265). He found that no manipulative, visual, communicative, or environmental limitations were established. (Tr. 266). Dr. Owen also stated that Plaintiff alleged some hearing loss, but conversed with the doctor without any problem being noted. (Tr. 270).

On March 16, 2007, Kristen Goins, LVN at the Collom & Carney Clinic, noted that she received a voice mail from Mandy Alexander, the nurse manager for Plaintiff, on March 12, 2007, inquiring as to whether Plaintiff would be a candidate to return for sedentary work. Ms. Goins spoke with Dr. Thompson, who, according to the note, said "yes", but she was unable to relay this to Ms. Alexander because she did not have a return phone number. (Tr. 280). On May 11, 2007, Plaintiff called the Collom & Carney Clinic, requesting that Dr. Thompson set up cervical esi's for her. (Tr. 279). The record reflects that Plaintiff was told that Dr. Thompson did not treat neck or back and that Plaintiff would need to see her primary care physician and get a referral from him. (Tr. 279).

On July 5, 2007, Plaintiff presented herself to Dr. Hasmakh M. Patel, complaining of chronic neck pain. (Tr. 297). On November 16, 2007, she complained to Dr. Patel of shoulder pain and

chronic left knee pain. (Tr. 290). Diagnostic imaging results reflected small peripheral osteophyte along the medial aspect of the left knee and normal study of the left shoulder. The impression was mild degenerative change. (Tr. 291). Another diagnostic imaging was performed on January 14, 2008, of Plaintiff's right lower extremity and was a normal study. (Tr. 289).

At the hearing held before the ALJ on January 30, 2008, Plaintiff testified that since the hip replacement, she has to constantly sit and lie down because of her pain and medication. (Tr. 321). She stated that she still has spasms in her left hip and leg that are severe and can not be controlled. (Tr. 322). She testified that she walked with a cane in order to keep from losing her balance, that she was deaf in her right ear and had only 40-50% hearing in her left ear.[1] (Tr. 323). (Tr. 323). She stated that her neck pains were so severe that she was stiff from her neck to her arms, and the pain was so severe that it could not be controlled. (Tr. 324). Dr. Patel prescribed medication and referred her to Dr. David Weber for steroid injections in her neck, the last one being received in October of 2007. (Tr. 325). Plaintiff contended that although she obtained some relief from the steroid injections, they could only stop the pain for so long. (Tr. 325). Plaintiff's pain was worse in her neck and hip, but she stated that she was also facing pain on the right side. Plaintiff testified that she had been taking hydrocodone since her hip surgery, was taking glucosamine and was also receiving steroid injections every six to nine months. (Tr. 333-334). Plaintiff stated that although the medications helped a little, they caused her to be drowsy all day long and night and that she could not function without the medication. (Tr. 326).

Plaintiff stated that during the day, she tried to do a little washing and cooking, but due to pain, medication and shortness of breath, she had to constantly sit and lie down. She still drove and

---

[1] Plaintiff stated that she had been deaf for about fifteen years. (Tr. 323).

ran errands and attended some church activities. (Tr. 327-328). Plaintiff had no problems sitting, but had to get up and walk around after sitting 10-20 minutes, because she would get stiff. (Tr. 333).

Dr. Patel completed a Physical RFC Evaluation on February 4, 2008, more than one and a half years after Dr. Steve Owen's Physical RFC Assessment was completed. (Tr. 312-314). In this evaluation, Dr. Patel concluded that Plaintiff required complete freedom to rest frequently without restriction and could sit less than two hours per regular work day. (Tr. 312). He further found that she could lift 5-10 pounds for less than 1/3 of the day, carry 5-10 pounds for less than 1/3 of the day, could not grasp, push and pull or do fine manipulation on a repetitive basis through a routine workday, and could not use her feet for repetitive movements throughout a workday operating foot controls. (Tr. 313). Dr. Patel based his conclusions on Plaintiff's history, reported symptoms and objective test results. (Tr. 314).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of

those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and, (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity (RFC). See McCoy v. Schwieker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

**Discussion:**

Plaintiff presented five issues on appeal: 1) The ALJ's decision was not supported by substantial evidence; 2) The ALJ failed to evaluate the severity of Plaintiff's impairments; 3)The ALJ erred by concluding Plaintiff retained the RFC to perform a full range of sedentary work activity; 4) The ALJ erred in failing to present a hypothetical to the VE; and 5) The ALJ erred in his credibility assessment of the Plaintiff. (Doc. #5).[2]

The ALJ found that Plaintiff had arthritis, cervical spondylosis with annular disc bulge, small left paracentral disc protrusion at C6-7, as well as disc protrusion at T3-4 level, and variable foraminal stenosis at C5-6; hearing loss; and chronic pain. (Tr. 10). He further found that Plaintiff had a severe impairment, but that the impairment, or combination of impairments did not meet or equal the level of severity for any impairment listed in Appendix 1 to Subpart P, Regulations No. 4 . (Tr. 10).  The ALJ found that Plaintiff's statements concerning her daily activities were inconsistent with the medical findings, believing that her limitations were on a self-imposed and voluntary basis. (Tr.11).  He found that Plaintiff's back, hip and neck pain were not corroborated by objective evidence in the record and that therefore, the frequency, intensity and duration of Plaintiff's symptomology would not more than minimally affect her ability to carry on gainful activity at the sedentary exertional level.  The ALJ found that Plaintiff's statement that standing, walking and sitting aggravated her condition was not fully credible in light of the overall medical

---

[2]The court notes that in the Certificate of Service of Plaintiff's Brief, Plaintiff's counsel listed Larry R. McCord as the Assistant U.S. Attorney for the Western District of Arkansas.  The court suggests that Plaintiff's counsel update his information regarding the appropriate name to list in the Certificate of Service.

record. (Tr.11). He further believed that the medications had been relatively effective in controlling Plaintiff's symptoms.

With respect to Plaintiff's hearing loss, the ALJ found that although the medical evidence reflected that Plaintiff had a significant hearing loss, there was no evidence that the hearing loss was not restorable by a hearing aid. He therefore concluded that the frequency, intensity and duration of Plaintiff's hearing loss would not more than minimally affect her ability to carry on gainful activity at the sedentary exertional level.

The ALJ found Dr. Patel's RFC evaluation to be in stark contrast to the evaluations of her other treating doctors, especially Dr. Thompson, who performed Plaintiff's hip replacement surgery. The ALJ also concluded that Plaintiff exaggerated her limitations and symptoms to some extent. (Tr. 14). The ALJ used relatively strong language with respect to Plaintiff's credibility:

> This case presents the issue of a self destructive attitude in a woman who has the cognitive ability to make reasonable and mature choices and, who the record supports, is seeking to minimize her capabilities in order to present herself in a light most favorable to obtain benefits. She has simply made a lifestyle decision and removed herself from working on a full-time basis, not because of a disability, but because of a voluntary choice that simply removes full time vocational functioning from consideration.

(Tr. 15).

Although the ALJ did not adopt the other doctors' opinions *per se*, he nevertheless found that Plaintiff had the RFC to do sedentary work, and because Plaintiff could not return to her past work, he relied upon the Medical-Vocational Guidelines found in Appendix 2 to Subpart P of Regulations No. 4 to conclude that there were substantial numbers of job in the national economy that Plaintiff could perform. He found that Plaintiff was capable of performing sedentary work activity which

involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. (Tr. 15).

The court first notes that although the VE was present and briefly testified at the hearing, the ALJ did not propose hypotheticals to the VE in order to determine whether there were jobs in the national economy Plaintiff could perform. Instead, his questions related to whether Plaintiff could perform past relevant work. The court recognizes that if a Plaintiff is found to have only exertional impairments affecting the ability to perform physical labor, the ALJ may refer to the Medical-Vocational Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational background, and previous work experience, with differing degrees of exertional impairment. See 20 C.F.R. Part 404, Subpart P, Appendix 2; Foreman v. Callahan, 122 F.3d 24, 26 (8th Cir. 1997); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992) (citations omitted). However, if Plaintiff is found to have nonexertional type impairments which diminish her capacity to perform the full range of jobs listed in the Guidelines, the ALJ must solicit testimony from a VE to establish that there are jobs in the national economy the Plaintiff could perform. Robinson, 956 F.2d at 841; Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001) (citations omitted).

Nonexertional impairments include those impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for fine activities. See Social Security Ruling 83-10, 1983 WL 31251 at *6 (1983).[3] The

---

[3] Social Security Rulings are final opinions and statements of policy of the Commissioner of Social Security, binding on all components of the Social Security Administration. 20 C.F.R. §422.406(b)(1) (1995); see also Carter v. Sullivan, 909 F.2d 1201, 1202 (8th Cir. 1990).

ALJ concluded that since Plaintiff's hearing loss could be improved with a hearing aid, it did not diminish Plaintiff's RFC to perform sedentary exertional work.

It is true that if the medical evidence clearly reflected that Plaintiff's hearing aid improved her hearing, it would be proper for the ALJ to find that the hearing loss did not significantly diminish the Plaintiff's RFC to perform the full range of sedentary exertional work. However, in the present case, the evidence is unclear as to the extent Plaintiff's hearing aid improved her hearing. For example, hearing loss was noted at the Collom & Carney Clinic on December 12, 2005. (Tr. 180). On April 7, 2006, when Plaintiff was interviewed face-to-face by the representative from the Social Security field office, Plaintiff had difficulty hearing the questions and therefore had problems answering them. (Tr. 57). The court recognizes that Dr. Richard Sharp, at Healthsouth, reported that Plaintiff had no hearing or visual problems, and that Dr. Steve Owens, a non-examining consultant, noted that Plaintiff alleged some hearing loss, but conversed with the doctor without any problem being noted. However, in light of the discrepancies in the record, the court fails to understand, especially since the VE was present at the hearing, why the ALJ did not solicit testimony from the VE at the hearing as to whether there were jobs in the national economy Plaintiff could perform even if she had hearing limitations.

The court is also concerned about the fact that the ALJ discredited the conclusions reached by Plaintiff's treating physician, Dr. Patel, in his February 4, 2008, Physical RFC Evaluation. He instead relied more heavily upon Dr. Thompson, the surgeon who performed the hip replacement, and Dr. Evans, the non-examining consultant whose Physical RFC Assessment was completed on July 10, 2006. Dr. Patel saw and treated Plaintiff for a good year after her surgery, while Dr. Thompson's last exam was performed on May 25, 2006.

When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the Plaintiff's impairments. 20 C.F.R. §416.927(d)(2)(ii). Additionally, the ALJ must either attempt to reconcile the medical reports of the treating physicians with those of the consulting physicians, or direct interrogatories to each of the physicians to obtain a more substantiated opinion of the Plaintiff's capabilities and the onset of her disabilities. See Smith v. Schweiker, 728 F.2d 1158, 1164 (8th Cir. 1984); O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); Funderburg v. Bowen, 666 F.Supp. 1291, 1298-1299 (W.D. Ark., 1987).

The court finds it appropriate to remand this matter to the ALJ, pursuant to sentence four of 42 U.S.C. § 405(g), with directions to submit interrogatories to Plaintiff's treating and examining physicians, asking them to review Plaintiff's medical records and to each complete a Physical Residual Functional Capacity Assessment, in order to obtain more substantiated opinions of the Plaintiff's capabilities and the onset of her disabilities. The court also notes that Dr. Owens found that Plaintiff had postural limitations and could only occasionally climb, balance, stoop, kneel, crouch and crawl (non-exertional impairments). Therefore, the ALJ is reminded to take these limitations into consideration when reconsidering Plaintiff's Physical Residual Functional Capacity.

The Court also suggests that the ALJ have a consultative examination of Plaintiff performed by a physician, and to ask that physician to complete and submit a Physical Residual Functional Capacity Assessment. The ALJ is also directed to solicit testimony from a VE, by presentation of hypotheticals, as to whether there are jobs in the national economy that Plaintiff could perform, taking into consideration all of Plaintiff's restrictions and limitations.

**Conclusion:**

Based upon the foregoing, the court hereby reverses the ALJ's decision and remands this matter to the ALJ, pursuant to sentence four of 42 U.S.C. §405(g), to proceed in accordance with the directions given herein.

IT IS SO ORDERED this 15th day of December, 2009

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE